**STEP–SAVER DATA SYSTEMS, INC., Appellant,**

v.

**WYSE TECHNOLOGY, The Software Link, Inc.**

**No. 89–1867.**

United States Court of Appeals, Third Circuit.

Argued March 12, 1990.

Decided Aug. 27, 1990.

(3d Cir.1976), because they were pendent to a federal claim against him which has been dismissed.

Ronald H. Silverman, Francis X. Clark (argued), John H. Kiefel, King of Prussia, Pa., for appellant.

Debra G. Buster, Stephen M. Dorvee, Edward J. Marcantonio (argued), Arnall Golden & Gregory, Atlanta, Ga., Frederick C. Fletcher, II, Swartz, Campbell & Detweiler, Philadelphia, Pa., for The Software Link, Inc., appellee.

Jay P. Hendrickson (argued), Hendrickson, Higbie & Cole, San Francisco, Cal., Joseph Schumacher, Abraham, Pressman &

Bauer, Philadelphia, Pa., for Wyse Technology, appellee.

Before SLOVITER, BECKER and STAPLETON, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This appeal arises from an action brought in the district court for the Eastern District of Pennsylvania by appellant, Step–Saver Data Systems, Inc. ("Step–Saver"), a vendor of packaged computer systems, against its hardware and software suppliers, defendants Wyse Technology ("Wyse") and The Software Link ("TSL"). Step–Saver sought a declaratory judgment that the defendants are liable *if* certain collateral actions filed by Step–Saver's customers establish defects in the products sold by defendants to Step–Saver, and after adaptation by Step–Saver, by Step–Saver to its customers. Step–Saver also sought consequential damages stemming from costs that Step–Saver incurred as a result of the allegedly defective products in an effort to satisfy its customers and retain its goodwill. Acting on defendants' motions for judgment on the pleadings, the district court dismissed Step–Saver's complaint as unripe. We agree with the district court that the declaratory judgment action was unripe, and we will affirm on that point. We do not agree with the district court that Step–Saver's direct (consequential) damages claim was unripe, and we will reverse that dismissal and remand for further proceedings.

## I. FACTS AND PROCEDURAL HISTORY [1]

Step–Saver, which is incorporated in Pennsylvania, was in the business of selling packaged computer systems to doctors, lawyers and other professionals. Originally a marketer of "single-user" computer systems, Step–Saver sought to expand the capability of its systems by marketing a multi-user computer system that would al-

low its customers' personnel to share information, access programs, and files. After seeing various advertisements in trade journals, Step–Saver contacted defendant TSL, a Georgia corporation with its principal place of business in Georgia, and negotiated to purchase a multi-user system known as the "Multi–Link Advanced" program. Step–Saver also contacted defendant Wyse, a Virginia corporation with its principal place of business in California, and negotiated to purchase Wyse computer terminals. TSL and Wyse warranted that the Multi–User Advanced system was compatible with the Wyse terminals. Both TSL and Wyse knew of Step–Saver's intention to incorporate the various products for resale as a multi-user computer system.

In late 1986, Step–Saver began selling the Wyse/TSL systems to law firms and medical offices in New York, New Jersey and Pennsylvania. Deliveries commenced in early 1987. Shortly thereafter, Step–Saver began to receive complaints from its customers, including claims that the basic typing and printing mechanisms did not work correctly and that the systems were "locking up." Step–Saver investigated these claims, substituted equipment at its own expense, and notified both defendants of the reported problems.

Defendants assured Step–Saver that any problem would be corrected in existing equipment and future sales. However, defendants did not supply any new equipment and, despite Step–Saver's attempts to rectify the situation, the goods continued to malfunction. At the time this suit was filed, twelve different lawsuits had been filed against Step–Saver by customers dissatisfied with the computer system they had bought from Step–Saver. Of these twelve customer suits, six are in the New York state courts, four are in the New Jersey state courts, one is in a Pennsylvania state court, and one was filed in the United States District Court for the Southern District of New York. Step–Saver attempted to join Wyse and TSL as third

---

1. The facts, which are set forth in cross motions for summary judgment, are essentially undisputed.

party defendants in all of these actions. In at least one of them, *Green Zinner, P.C. v. Step–Saver Data Systems, Inc.*, filed in the Southern District of New York, the court dismissed the complaint as to TSL for lack of personal jurisdiction.[2]

Shortly thereafter, Step–Saver filed the instant action in the Eastern District of Pennsylvania, and filed a petition for bankruptcy under Chapter 11 in the bankruptcy court of that district. The bankruptcy action automatically stayed all of the pending lawsuits, but Step–Saver secured relief from the automatic stay to proceed with this action in the district court.

Step–Saver's complaint, entitled "Complaint for Declaratory Judgment,"[3] seeks a declaratory judgment that defendants are responsible for any liability that Step–Saver may have to its customers as a result of the customer suits. It also alleges that Step–Saver incurred over $75,000 in direct damages as a result of the products' defects. Framing the issue as one solely for a "declaratory judgment in which [Step–Saver] demand[ed] contribution and indemnification from the defendants," the court found the action to be at odds with the purposes of the Declaratory Judgment Act and dismissed it. The court also stated in its opinion that a continuation of the litiga-

tion would unnecessarily interfere with the business of other state and federal courts.

On appeal, Step–Saver contends that the district court ignored its direct damages claim, and that the ripeness determination failed to recognize the substantive right to indemnification embodied in the Uniform Commercial Code ("U.C.C."). Defendants respond that the basic problem with both of Step–Saver's claims is that Step–Saver has not, and will not, incur any compensable loss until the underlying customer suits are adjudicated. Because the focus of the district court's opinion was on the viability of the declaratory judgment action, we address that issue first.[4]

## II.  THE DECLARATORY JUDGMENT

### A.  *Is The Case Ripe?*

As many commentators have noted, it is difficult to define the contours of the ripeness doctrine with precision.[5] The task is even more problematic when defining ripeness in the context of declaratory judgment actions, for two reasons. First, there is the considerable amount of discretion built into the Declaratory Judgment Act itself.[6] Even when declaratory actions are ripe, the Act only gives a court the *power* to make a declaration regarding

---

**2.** We do not know whether the other courts would have dismissed the third party actions against TSL for the same reasons. It is quite likely that at least the state courts of New York would have done so. The district court for the Southern District of New York applied New York's long-arm statute in making its determination, and it seems likely that the six New York state courts, making the same determination and applying the same law, would come to the same conclusion.

**3.** Step Saver included another complaint, entitled simply "Complaint," in its appendix to this court. However, that complaint post-dates the district court's decision; it was not before the district court. Thus, it is not properly before us.

**4.** Much of our analysis of both claims depends on interpretation of state contract law. Although, in this diversity case, there are numerous states whose law might apply—including New York, New Jersey and Pennsylvania where the customers resided and the systems were installed, and Pennsylvania, Georgia and California, where the parties to this action may have contracted—we cannot, on this limited record,

determine which law applies to which actions. All of the relevant states have adopted the U.C.C., and the parties have not suggested that, on the relevant points, the U.C.C. case law differs among the possibly relevant states.

**5.** *See* L. Tribe, *American Constitutional Law* 82 (2d ed. 1988) ("[T]he categorization of a case as unripe for federal adjudication cannot be reduced to an orderly, much less highly principled and predictable, process."); Shapiro, "Jurisdiction and Discretion," 60 N.Y.U. L.Rev. 543, 553 (1985) ("The doctrine of ripeness ... has a large discretionary element. . . .").

**6.** 28 U.S.C. § 2201 states:

In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

"the rights and other legal relations of any interested party seeking such declaration," 28 U.S.C. § 2201; it does not *require* that the court exercise that power. Second, declaratory judgments are issued before "accomplished" injury can be established, *see* E. Borchard, *Declaratory Judgments* 29 (1941), and this *ex ante* determination of rights exists in some tension with traditional notions of ripeness. Nonetheless, because the Constitution prohibits federal courts from deciding issues in which there is no "case[ ]" or "controversy," U.S. Const. art. III, § 2, declaratory judgments can be issued only when there is "an actual controversy," 28 U.S.C. § 2201. The discretionary power to determine the rights of parties before injury has actually happened cannot be exercised unless there is a legitimate dispute between the parties.

The Supreme Court observed in *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941):

The difference between an abstract question and a "controversy" contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

Justice Murphy was, in large part, expanding on the dictates of the Supreme Court just four years earlier in *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937):

The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests.... It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

Professor Borchard, the leading scholar in the field of declaratory judgments, suggested that the Pennsylvania Supreme Court's characterization of ripeness may also be useful:

[The Court must be] satisfied that an actual controversy, or the ripening seeds of one, exists between parties, all of whom are sui juris and before the court, and that the declaration sought will be a practical help in ending the controversy.

*Kariher's Petition*, 284 Pa. 455, 471, 131 A. 265, 271 (1925), *quoted in* E. Borchard, *Declaratory Judgments* 57 (1941).

█ None of these discussions gives us a readily applied test. However, we are able to glean from them certain basic principles which guide our disposition. The most important of these principles are the adversity of the interest of the parties, the conclusiveness of the judicial judgment and the practical help, or utility, of that judgment. *See also* E. Borchard, *supra*, at 56–62; 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2757 (2d ed.1983).

### 1. Adversity of Interest

█ Step–Saver's request for relief is contained in paragraph 30 of its complaint, which asks the court to find that:

If [the customer suits] can establish defects as alleged by [Step–Saver's] customers, then Defendants' conduct constituted intentional misrepresentation as to the nature and capacity of their programs and equipment.

The main problem with this request lies in its first word, "if." Whatever defendants' warranties may have said, the defendants are not liable for damages that Step–Saver itself has not incurred. Step–Saver acknowledges this by framing its requested declaration as a contingency. It asserts that it "has been damaged in the amount of any liability it may hold to various [consumers]." But it does not ask the defendants to pay unless and until Step–Saver is found liable elsewhere. Thus, the declaratory request does not claim the direct damages resulting from the alleged breach, and

it could not because those damages have not yet been incurred.

The requested declaration would render defendants liable on the basis of judgments in the customer suits. The problem with this result is that the customer suits may establish a defect for which the defendants are not liable. If the malfunctioning of the machines resulted from Step–Saver's errors in putting the packages together, then Step–Saver must bear the entire liability. On the other hand, if the malfunctioning was due to defects in the terminals and software, then both Wyse and TSL would likely be held liable. Moreover, the defendants may eventually concede their liability without a lawsuit. If evidence produced in the customer suits makes these defendants' liability all but inevitable, they may prefer to admit liability in order to avoid the expense of an indemnity action instituted by Step–Saver. Nonetheless, at this stage, nothing obliges Wyse and TSL to admit or deny their own liability because they have not been given a concrete idea of what defect they are being charged with. These factors strongly militate against a finding of adversity.

Also significant is the fact that Step–Saver has not, in its declaratory judgment action, asked this court to find defendants liable for the damages for breach. Rather, Step–Saver has only asked us to declare defendants liable *if* another court finds defect. But, defendants have not, to this date, in this action, denied liability for damages for breach. Whether or not they have been yet called upon to do so is beside the point. What matters is that without that denial, the parties interests are insufficiently adverse. "For there to be an actual controversy the defendant must be so situated that the parties have adverse legal interests." 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2757, at 582–83 (2d ed.1983). Until the defendants are forced to decide whether or not to concede liability on the breach issue, they are not so situated. And, until the defendants deny liability on the breach damages, we have nothing to adjudicate. "[I]n the absence of some form of overt conduct on the part of the Defendant alle-gations regarding [what the defendants may have done are] insufficient to form the basis of an actual controversy necessary to give the Court jurisdiction under the Declaratory Judgment Act." *Gates Energy Products v. Yuasa Battery Co.,* 599 F.Supp. 368, 375 (D.Colo.1983).

### 2. Conclusivity

Neither would any decree issued by the district court be sufficiently conclusive to define and clarify the legal rights or relations of the parties. As we have noted, by its terms, the decree that Step–Saver asks for is based on a contingency—"if [the customer suits] can establish defect." Thus, even if we issued the requested declaration, the legal status of the parties would not change (nor would it be clarified), because our declaration itself would be a contingency. Indeed, such a declaration would probably be an exercise in futility because Step–Saver and the defendants would be left to do battle on the issue of whether the "liability," for which we declared the defendants responsible, was really the liability that will be established in the consumer suits. As noted above, it would be possible, particularly given Step–Saver's significant role in combining the relevant equipment packages, for Step–Saver, but not the defendants, to be liable to the customers.

We find nothing in *Aetna Life* to the contrary. In *Aetna Life*, the Supreme Court found justiciable an insurance company's request that a disability policy "be declared to be null and void by reason of lapse for nonpayment of premiums." 300 U.S. at 239, 57 S.Ct. at 463. In order to determine whether the policy should be null and void, a court had to determine if, in fact, the payments had been made. The Court held that although "the dispute turn[ed] upon questions of fact [that did] not withdraw it … from judicial cognizance." *Id.* at 242, 57 S.Ct. at 465. In *Aetna Life*, the plaintiff insurance company asked the court to find a fact and then construe the insurance contract accordingly. In this case, Step–Saver is asking the court to construe the contract without find-

ing the necessary fact, i.e. the identity and source of the defect.[7] The requested declaration leaves the factfinding role up to the courts hearing the customer suits. Construing a contract and making law without finding the necessary facts constitutes advisory opinion writing, and that is constitutionally forbidden. Any contest must be based on a "real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life*, 300 U.S. at 241, 57 S.Ct. at 464.

▮ We do not intimate that the kind of proof necessary to establish defect in this case could never be offered in a declaratory judgment proceeding. Arguably, Step–Saver could subpoena the customers as witnesses, and prove, to the satisfaction of the court hearing the declaratory judgment action, that the malfunctioning was a result of defendants' defective manufacture. In such a case, Step–Saver would be asking the court to construe the contract *after* making the necessary factfinding regarding the defect. We do not have to decide whether this kind of declaratory request would be appropriate because Step–Saver did not ask the court to engage in this kind of factfinding. Nothing in the record indicates that Step–Saver wanted to prove the defects itself; if it had intended to do this, it would not have phrased its request as a contingency.[8]

### 3. Utility

Finally, we note that a declaratory judgment would be of remarkably little use at this stage.[9] One of the primary purposes behind the Declaratory Judgment Act was to enable plaintiffs to preserve the status quo before irreparable damage was done, *see* E. Borchard, *supra*, at 58, and a case should not be considered justiciable unless "the court is convinced that [by its action] a useful purpose will be served." *Id.* at 29. The idea behind the Act was to clarify legal relationships so that plaintiffs (and possibly defendants) could make responsible decisions about the future. As Congressman Gilbert remarked in debate, "[u]nder the present [pre-Declaratory Judgment Act] law, you take a step in the dark and then turn on the light to see if you stepped into

---

**7.** As Professor Borchard notes, there are some situations in which courts can make a declaration absent proof of a necessary fact. If a future event is "certain to occur, such as enforcement of an existing statute or the death of a life-tenant or the future expiration of a contract, franchise or lease," E. Borchard, *supra*, at 37–38, then the legal interests may be considered adverse enough. However, the necessary fact at issue here is quite uncertain. Unlike the future events which Borchard lists, almost all of which are simply "a matter of time," the necessary future event for Step–Saver's request (i.e., finding that the computers were defective in a manner attributable to defendants) is far from certain. The computers could have been defective when delivered to Step–Saver's customers for any of a number of reasons, some of which would not render the defendants liable.

**8.** We decline to construe Step–Saver's request for declaratory relief "liberally," or to presume that Step–Saver wanted the district court to engage in the necessary factfinding. Throughout the record, Step–Saver referred to the customer suits as the basis of liability. It did not intimate, anywhere, that it wanted the court to determine the defective nature of the products. While arguably the declaratory judgment action was of limited value to Step–Saver in the absence of such factfinding, it appears that Step–Saver made a strategic decision to do no more than establish in the district court a vehicle for making the defendants account for liability imposed upon them in other jurisdictions where service could not be had on Wyse or TSL. Apparently at the heart of the strategy was the unwillingness to admit in the Eastern District of Pennsylvania that the products were defective while denying defect in the customer suits. Moreover, we doubt that courts are free to construe declaratory requests liberally. Although the Declaratory Judgment Act vests courts with a great deal of discretion, we do not think that Congress meant to confer on the courts the right to declare as law, something that has not even been asked for by the parties.

**9.** The conclusivity inquiry, just discussed, goes to whether the parties' rights will be definitively decided by a declaratory judgment. In this case, we cannot answer that question affirmatively because the parties' legal rights cannot be decided until the underlying factfinding has been done. The utility inquiry, discussed presently, goes not to whether the legal rights will be clarified, but to whether the parties' plans of actions are likely to be affected by a declaratory judgment.

a hole. Under the declaratory judgment law you turn on the light and then take the step." 69 Cong.Rec. 2108 (1928).

In this case, Step–Saver will take the same steps whether the light is on or not. As we explain below, *see infra* Part IIIB, Step–Saver has already vouched in the defendants under U.C.C. § 2–607(5)(a). Because defendants chose not to defend the customer suits on their own, they will be held liable as long as the defect proven in the customer suits is attributable to them. *See generally* A. Squillante & J. Fonseca, 3 *Williston on Sales* 291–92 (4th ed. 1974) ("The seller-warrantor cannot object to liability on the ground that no jurisdiction attached to him over the litigation involved because the vouching in letter merely asserts that he has liability over to the warrantee. Jurisdiction is not a prerequisite for the effective application of the vouching in letter."); *Restatement (Second) of Judgments* § 57 comment c, illustration 4 (1982) ("[A] refusal to submit to jurisdiction ... may be a proper basis for estopping the indemnitor from contesting determinations in the principal action."). Thus, the declaration will not be of significant "practical help in ending the controversy," *Kariher's Petition*, 284 Pa. 455, 471, 131 A. 265, 271 (1925), because the declaration would merely do what established products liability law and U.C.C. § 2–607(5) already do, i.e. make the manufacturer ultimately liable for *defective* products.

### B. *The U.C.C. and the Right to Indemnity*

■ Step–Saver counters the ripeness analysis by analogizing its contracts with defendants to an insurance contract. Citing *ACandS, Inc. v. Aetna Casualty & Surety Co.*, 666 F.2d 819 (3d Cir.1981), it contends that the underlying suits need not be adjudicated first. In *ACandS*, the district court dismissed as non-justiciable an insulation installer's request for a judgment declaring that its comprehensive liability insurer had a duty to defend in the numerous asbestosis suits that had been filed against *ACandS*. We reversed, holding that the controversy regarding the insurer's duty to defend was ripe even

though liability had not been definitively established in the underlying suits.

*ACandS* is inapposite. *ACandS* involved a contract to indemnify and defend, not a common law indemnification obligation. As *Restatement (Second) of Judgments* § 58 comment a (1982) states:

> [T]he ... "independent duty to defend" does not ordinarily attend indemnity obligations imposed by law rather than by contract, nor is it ordinarily encountered in indemnity contracts other than those entered into by liability insurers.... Although such a duty to provide a defense [can] attend[ ] the indemnity obligation, it is independent of that obligation in two senses. First, it has a larger scope than the obligation to indemnify. It applies not only to claims against the indemnitee that, viewed when the action against the latter is initiated, "are" or "reasonably appear to be" within the scope of the indemnity obligation but also to claims that "arguably are" or "might be found to be" within that scope. Second, the purpose of creating the duty is not to provide indemnity against loss by the injured person, but to provide insurance against the risk of being sued. It is in substance legal expense insurance.

The defendants here are not liability insurers, and Step–Saver did not contract for indemnity. It did not "purchase" legal expense insurance. Unlike the insurance companies in *ACandS*, the defendants did not promise to defend suits brought by Step–Saver's customers. Therefore, the defendants here are not responsible for litigating claims for which they "arguably are" or "might be found to be" liable.

In sum, these defendants have a duty to pay if they breached their warranties to Step–Saver, but that duty stems from basic warranty law, and it does not include a duty to defend. The obligation to defend, which arises—if it is to arise—before the obligation to pay, had arisen in *ACandS*. But the obligation to pay is all that may arise in this case, and it cannot arise until Step–Saver can prove that it is liable for defects ultimately attributable to the defendants.

Step–Saver responds by asserting that even if the duty to defend was not part of its contract with the defendants, that obligation can arise from sources other than direct contracts. More specifically, Step–Saver invokes U.C.C. § 2–607(5), which states:

> Where the buyer is sued for breach of a warranty or other obligation for which his seller is answerable over
>
> (a) he may give his seller written notice of the litigation. If the notice states that the seller may come in and defend and that if the seller does not do so he will be bound in any action against him by his buyer by any determination of fact common to the two litigations, then unless the seller after seasonable receipt of the notice does come in and defend he is so bound.

Step–Saver contends that this "vouching in" provision imposes on the defendants an obligation to indemnify *and* defend.

In support of its claim that § 2–607(5) creates a duty to defend, Step–Saver relies heavily on *City of Clayton v. Grumman Emergency Products,* 576 F.Supp. 1122 (E.D.Mo.1983). In *Clayton,* a manufacturer sold a fire truck to a retailer, who in turn sold it to the city of Clayton. The city sued the retailer, who named the manufacturer as a third party defendant. The district court found that a specific indemnity contract was not necessary and that in the product liability context a retailer has a right to indemnification from the manufacturer based on a breach of implied or express warranty. The court explained that in order:

> [t]o establish this right [to indemnification], the retailer must show that (1) he bought the part from the manufacturer to be held liable, (2) the same express or implied warranties he made to the consumer were made to him by the manufacturer, (3) the defect on which the retailer's breach of warranty liability was established constitutes a breach by the manufacturer of the same warranty as made to the retailer, and (4) he gave

notice of the consumer's lawsuit against him to the manufacturer.

*Id.* at 1128. The court cited U.C.C. § 2–607(5) in support of this proposition.

We doubt, however, that *Clayton* stands for the proposition for which Step–Saver cites it. The court said that the right to indemnity inures if "the defect on which the retailer's breach of warranty liability *was* established constitutes ... the same warranty as made to the retailer" *Id.* (emphasis added). The use of the past tense indicates that the court understood the right to indemnity to inure only after liability had already been established. The right to a defense is the right to have the person charged defend the action in which liability will (or will not) be established. Thus, the *Clayton* court was likely not referring to the right to a defense when it referred to the right to indemnity.

To the extent that *Clayton* invokes U.C.C. § 2–607(5) for the notion that a duty to defend is a part of every U.C.C. contract, we decline to follow it. Section 2–607 was intended as a codification of the common law vouching in rules. The U.C.C. Official Commentary states that "[s]ubsection 5(a) codifies for all warranties the practice of voucher to defend." The common law vouching in requirements grew up as a means of providing defendants with notice of impending actions which ultimately might affect them. The point of vouching in was to notify the original vendor that the buyer (in this case, Step–Saver) would seek to hold it liable in indemnity for the defect being tried in the customer suit. Vouching in was also meant to encourage the original vendor, upon whom ultimate liability rests, to bear the costs of litigation. *See generally* A. Squillante & J. Fonseca, *supra,* § 22–10(e). However, "[t]here was no means under the common law by which a defendant could bring into the action a third person liable over to him or severally liable with him to the plaintiff." R. Anderson, 4 *Uniform Commercial Code,* § 2–607:66 (3d ed. 1983).

Impleader rules and third party practice, *see* Fed.R.Civ.P. 14, 19, have largely sup-

planted U.C.C. § 2–607(5).[10] However, nothing in the text or the Official Commentary to the U.C.C. § 2–607, supports Step–Saver's contention that § 2–607 was supposed to create a theretofore nonexistent substantive duty to defend. Indeed, the commentators suggest to the contrary when they address the implications of a warrantor's failure to defend after receiving § 2–607 notification. *See* R. Anderson, *supra*, § 2–607:74 ("When the warrantor does not appear and defend an action brought against his warrantee after having received proper notice thereof, the record of that action is admissible in evidence in a *subsequent* action brought by the warrantee against the warrantor." (emphasis added)); A. Squillante & J. Fonseca, *supra*, § 22–10(5)(a) ("Where the seller makes no attempt to answer his buyer's request to come in and assume the defense of the breach of warranty action, that buyer cannot expect indemnification in any *subsequent* action against his seller unless he has met the prerequisites established by § 2–607(5)." (emphasis added)).

These commentators refer to the effects of § 2–607(5) in a subsequent action between the warrantor and the warrantee, but if § 2–607(5) creates a substantive duty to defend, the warrantor would be obliged to defend in the *primary* action brought by the consumer. Thus, if § 2–607(5) imposed an obligation to defend, all of the relevant liabilities (between warrantor, warrantee and consumer) would be resolved in one action. This kind of consolidation may make sense as a policy matter, but if the noted scholars just quoted understood it to be the law, they would not have discussed

what should happen in subsequent proceedings. If § 2–607(5) were meant to create a substantive duty to defend, there would be no need for subsequent proceedings.[11]

Thus, we will affirm the district court's dismissal, on ripeness grounds, of the declaratory judgment action. At this juncture, there is insufficient controversy between the parties, and a declaration would be inconclusive and of no real utility. If the defendants had a duty to defend, as opposed to a duty to pay, our result would be different, but, despite Step–Saver's contentions to the contrary, we find no such duty to defend in the history of the vouching in doctrine, the incorporation of that doctrine into the U.C.C. or the case law interpreting U.C.C. § 2–607(5).

## III.  DIRECT DAMAGES

■ Step–Saver's second claim seeks "direct damages," i.e., costs incurred directly by it trying to maintain its customers' goodwill despite their complaints about the quality of equipment supplied by Wyse and TSL. These damages include "out-of-pocket expenses for customer assistance; service calls; additional or substitute programs and equipment supplied; ... costs of defense of suits; loss of profits in sales and loss of goodwill in connection with its sales to other actual and potential Multi-User customers." We interpret this claim as one for consequential damages under U.C.C. § 2–715(2), which provides:

Consequential damages resulting from the seller's breach include

(a) any loss resulting from general or particular requirements and needs of

---

**10.** In the great majority of contract disputes like this one, the warrantor is joined or impleaded. *See* R. Anderson, *supra*, § 2–607:66 ("Rules of civil procedure and statutes have been adopted or enacted in many jurisdictions providing that when a defendant shows that some third person, may be ... liable ... the joinder of such other person as a party or defendant may be obtained."); A. Squillante & J. Fonseca, *supra*, § 22–10(2), at 283 ("Vouching in has been supplanted, in great measure by the advent of third party practice or impleader."). However, impleader rules are subject to basic due process requirements, and they cannot, in and of themselves, give a court personal jurisdiction over

the warrantor. *See generally Restatement (Second) of Judgments* §§ 57, 82 (1982).

**11.** *See also* G. Wallach, *The Law of Sales Under the Uniform Commercial Code* § 10–05[4] (1981). Professor Wallach examines third party claims under both the *Restatement (Second) of Contracts* and U.C.C. § 2–607(5), noting that "either approach allows the buyer to claim ... any judgment obtained by the third party." Nowhere does Wallach suggest that either the U.C.C. or the Restatement suggests that buyers have the right to join the warrantor in the original third party suit.

which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise....[12]

Although Wyse argues that Step–Saver cannot prove causation because Wyse's liability is contingent on "liability creating conduct" which is being proven elsewhere, the "liability creating conduct" could be proven by Step–Saver at trial in the district court. The consumers may establish the defectiveness in a collateral proceeding, but that does not mean that Step–Saver cannot also establish it here. Step–Saver has not proven liability creating conduct, i.e., defect, yet, but it might very well be able to if given the opportunity. Thus, we do not classify the flaw in Step–Saver's complaint as one of inability to prove causation.

The district court apparently did not view the consequential damage claim as independent of the declaratory judgment claim. Although towards the end of its opinion it suggests that it was dismissing the entire action in part because of the "unnecessary interference with the pending litigation in eleven state courts and one federal court," its discussion focuses almost entirely on the claim for declaratory relief. We conclude that the district court erred in failing to consider the direct damages issue.

■ Section 2–715(2) of the U.C.C., quoted above, makes it possible for a non-breaching party to obtain consequential damages. *See* G. Wallach, *The Law of Sales* ¶ 10.04[1][b], Comment 3 to § 2–715 ("[T]he seller is liable for consequential damages in all cases where he had reason to know of the buyer's general or particular requirements at the time of contracting."). The test is one of foreseeability. Professors White and Summers "stress that the Code calls for liberal application of the foreseeability test: 'It is not necessary that there be a conscious acceptance of an insurer's liability on the seller's part, nor is

his obligation for consequential damages limited to cases in which he fails to use due effort in good faith.'" J. White & R. Summers, 1 *Uniform Commercial Code* 518 (3d ed.1988) (quoting Official Comment 3, *supra* ).[13]

■ Thus, consequential damages may be recovered, even though Step–Saver is not (at this point) legally responsible for the underlying obligation. *See Coastal Modular Corp. v. Laminators, Inc.*, 635 F.2d 1102 (4th Cir.1980) (contractor could pursue damages claim against supplier once consumer had notified contractor that if the contractor did not replace the defective goods, the consumer would contract elsewhere and charge the cost of that replacement to the original contractor); *Woodbury Chemical Co. v. Holgerson*, 439 F.2d 1052 (10th Cir.1971) (plaintiff could recover cost of respraying aerial insecticide as consequential damages from the seller of defective weedkiller even though plaintiff was not legally obliged to respray as long as plaintiff showed that it was standard commercial practice to respray). Commentators have endorsed this approach because "it recognizes practical obligations that require a businessman to conform to custom and usage in his trade in order to stay in business." J. White & R. Summers, *supra*, at 520. Thus, even if Step–Saver was not under a legal obligation to reimburse its customers for the damages they suffered—for instance, if Step–Saver was to settle with all of its customers or if the customers dropped the suits voluntarily—it might still be entitled to these damages.

■ To the extent that the district court's treatment of Step–Saver's direct damages claim reflects a decision that they were never recoverable, or that if they were, they could not be recovered yet be-

---

**12.** Although defendants maintain that the declaratory judgment suit does not contain a direct damages claim, we disagree.

**13.** In addition, if the defendants sold defective products in breach of their warranties, they are

liable for "the difference ... between the value of the goods accepted and the value they would have had if they had been as warranted." U.C.C. § 2–714(2).

cause the customer suits were pending and thus the consequential damages claim was not ripe, we disagree. Step–Saver has spent money responding to consumer complaints, replacing malfunctioning equipment and trying to maintain its reputation and goodwill despite its customers' complaints. Furthermore, defendants' liability for such claims does not necessarily depend on future contingencies or events yet to happen. If defendants are liable, they are liable because the computers they sold were defective and those defects caused Step–Saver to incur consequential damage. No future event will affect a determination of whether or not the computers were defective when sold. Because the duty to pay consequential damages to a buyer exists independent of the buyer's liability to others for defects in the products, we cannot say that Step–Saver's direct damages claim is not ripe. Since Step–Saver has stated a ripe claim for consequential damages, we must reverse the district court's dismissal of the direct damages portion of this action.[14]

## IV. CONCLUSION

For the foregoing reasons, the order of the district court will be affirmed in part, and reversed in part, and remanded for further proceedings consistent with this opinion.

---

**14.** The district court's expressed concern about "the unnecessary interference with the pending litigation in eleven state courts and one federal court," and its citation to *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), raises a possible question of abstention. Presumably, the district court was concerned about the duplication of effort resulting from parallel suits, the burden that might be imposed upon the customers if they are deposed or called as witnesses in the district court in Philadelphia, and the risk of inconsistent verdicts. The principles of *Colorado River* rest on considerations of "'wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" *Colorado River,* 424 U.S. at 817, 96 S.Ct. at 1246 (quoting *Kerotest Mfg. Co. v. C–O–Two Equipment Co.,* 342 U.S. 180, 183, 72 S.Ct. 219, 221, 96 L.Ed. 200 (1952)). However, abstention must be considered "'the exception not the rule,'" *Moses H.*

*Cone Memorial Hospital v. Mercury Const. Corp.,* 460 U.S. 1, 14, 103 S.Ct. 927, 936, 74 L.Ed.2d 765 (1983) (quoting *Colorado River,* 424 U.S. at 813, 96 S.Ct. at 1244). If the district court wishes to consider abstention (or a stay in lieu of dismissal on abstention grounds) it will have to develop a record and make *Colorado River*-oriented findings, weighing whether "principles unrelated to considerations of proper constitutional adjudication and regard for federal-state relations which govern in situations involving the contemporaneous exercise of concurrent jurisdictions ..." *Colorado River,* 424 U.S. at 817, 96 S.Ct. at 1246, outweigh an otherwise appropriate exercise of federal jurisdiction. *Colorado River* of course, does not apply to the case pending in the district court in New York. *Cf. Landis v. North American Co.,* 299 U.S. 248, 57 S.Ct. 163, 81 L.Ed. 153 (1936). We note the foregoing in light of the district court's expressed concern, but we intimate no view on the subject.