NYGAARD, Circuit Judge,
dissenting:
I would affirm the District Court’s disposition of N.E. Hub’s field preemption claim. Therefore, I dissent. Central to the Majority’s holding is its assertion that “we need not characterize definitively the type of preemption implicated here.” Majority at 346. I believe that characterizing N.E. Hub’s claim is the first and most important issue in this case. By failing to resolve it, the Majority ignores binding Supreme Court precedent and unnecessarily complicates a well-settled area of law. Especially troubling are its proposal of a new class of *350 “hybrid” preemption, and its reference to a mysterious “process” preemption.
Congress intended to occupy the field of law at issue. Therefore, the disputed appeals are subject to federal field preemption. Nonetheless, I would affirm the District Court’s decision, because FERC properly exercised its congressionally delegated authority by requiring compliance with state permitting procedures. More importantly, even if FERC overstepped its bounds, the proper course for N.E. Hub would have been to challenge FERC directly under the guidelines established by federal statute. Because N.E. Hub failed to do so, I agree with the District Court that we lack jurisdiction to consider the current claim.
I.
A brief review of the law of preemption is instructive. Assuming it has the constitutional power to legislate in a given area, Congress can preempt state law whenever it intends federal law to control. See Freehold Cogeneration Assocs., L.P. v. Board of Regulatory Comm’rs of State of New Jersey, 44 F.3d 1178, 1190 (3d Cir.1995) (“[T]he application of the preemption doctrine requires a determination of congressional intent in enacting a federal law.”). The key inquiry is congressional intent, which can either be explicit or implied. When it is implied, intent can take one of two forms. First, “[ijf Congress evidences an intent to occupy a given field, any state law falling within that field is preempted.” Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984). Congressional intent to occupy a field can be inferred from:
a ‘scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room to supplement it,’ ‘because the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject,’ or because ‘the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose.’
Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm’n, 461 U.S. 190, 204, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983). Second, if Congress has not occupied an entire field, “state law is still preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law.” Id.
In sum, there are three circumstances under which federal law preempts state law: (1) when Congress, through explicit statutory language, defines an area in which federal law controls, (2) when Congress implicitly indicates an intent to occupy a given field to the exclusion of state law, and (3) when federal law actually conflicts with state law. See Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992); Buzzard v. Roadrunner Trucking, Inc., 966 F.2d 777, 780 (3d Cir.1992). We have consistently analyzed preemption claims according to this framework. See Abdullah v. American Airlines, 181 F.3d 363, 367 (3d Cir.1999).
II.
Next, I turn to N.E. Hub’s specific claim. In Schneidewind v. ANR Pipeline Co., the Supreme Court held that Congress intended to occupy the field at issue.[1] See 485 U.S. 293, 308, 108 S.Ct. 1145, 1155, 99 L.Ed.2d 316 (1988) (“[T]he control of rates and facilities of natural gas companies ... are precisely the things over which FERC has comprehensive authority.”). The Court noted that it “is now well settled[that] Congress occupied the field of matters relating to wholesale sales and *351 transportation of natural gas in interstate commerce.” Id. at 305, 108 S.Ct. at 1153. An overwhelming amount of authority supports this assertion.[2] Even in Maritimes & Northeast Pipeline, L.L.C., No. CP97-238-001, 1997 WL 812154, at *8 (F.E.R.C. Nov. 4, 1997), the case most heavily relied upon by CNGT and Penn Fuel, FERC noted that “the NGA preempts State and local agencies from regulating the construction and operation of interstate pipeline facilities.” It is simply beyond peradventure that Congress intended the NGA to occupy the field of law at issue.
Both the Majority and the District Court disagree and hold that field preemption does not apply. The District Court expressly rejected field preemption, but nonetheless addressed and rejected the claim on its merits. The Majority purports to avoid categorizing the claim, but still implicitly endorses conflict preemption. I believe that field preemption does apply, but I agree with the District Court that the claim fails on its merits. This is an important question. If field preemption applies but FERC validly exercised its authority, we should affirm the District Court’s decision and not remand the case. Fundamentally, the resolution of this question — whether field preemption applies— controls whether this case is remanded or affirmed. I therefore review the opinions of the Majority and District Court in turn.
A.
The Majority at first seems to agree with me that field preemption should apply. It states that “[t]he district court [held] that this case does not involve field occupation. We, however, strongly doubt that the district court was correct.” Majority at 346 (emphasis added). The Majority fails to apply field preemption, however, and instead holds that “we need not characterize definitively the type of preemption implicated here to determine ripeness.” Majority at 346. In spite of this, I believe that the Majority tacitly does characterize N.E. Hub’s claim. It rejects field preemption and endorses conflict preemption, even though its reasoning assumes that Congress has occupied the field.
The District Court’s decision requires us to categorize the claim in this case, because it addressed N.E. Hub’s two preemption “theories” and reached different outcomes for each. The court held that conflict preemption was not ripe, but rejected field preemption on separate grounds.[3] The Majority states that ripeness “is the only issue before us.” Majority at 346. The District Court discussed ripeness only in connection to conflict preemption. Therefore, the Majority’s opinion, to the extent that it exclusively focuses on ripeness, holds that only conflict preemption is at issue.
Furthermore, because courts need only address conflict preemption in the absence of field preemption, see Silkwood, 464 U.S. at 248, 104 S.Ct. at 621 (“If Congress has not entirely displaced state regulation over *352 the matter in question, state law is still preempted to the extent it actually conflicts with federal law.”), the Majority’s focus on ripeness tacitly rejects field preemption. If field preemption applied, there would be no reason to analyze the ripeness of the conflict preemption claim.[4] In fact, the Majority explicitly holds that N.E. Hub never raised a field preemption claim. See Majority at 349. Thus, even though it “strongly doubt[s] that the district court was correct [to reject field preemption],” Majority at 346, the Majority rejects it as well.
Instead, the Majority suggests that we have a “hybrid situation” in which “there is field occupation but FERC ... has converted the case into a conflict preemption matter.” Majority at 346-47 n. 13. I disagree with this characterization for two reasons. First, neither law nor logic suggests the existence of such a thing, and second, for reasons I explain more fully in Section H.B., supra, FERC does not have the authority to abdicate its eongressionally delegated authority.[5] In addition, I fail to see how this “hybrid” differs practically from pure conflict preemption considering that FERC “has converted the case into a conflict preemption matter.” Majority at 346-47 n. 13 (emphasis added). If a “hybrid” preemption claim carries with it a different standard, the Majority does not describe what it might be. For these reasons, I believe that the Majority, in spite of its language to the contrary, tacitly did categorize N.E. Hub’s claim as conflict preemption, and the District Court must apply that doctrine upon remand.
The Majority offers two additional arguments to support its position: (1) field and conflict preemption overlap and are difficult to distinguish, and (2) the existence of a legal process can form the basis of a field or conflict preemption claim. See Majority at 348-49. When reviewed carefully, neither support the Majority’s holding; in fact, both ironically assume that Congress has preempted the field.
First, the Majority argues that it need not characterize N.E. Hub’s claim, because field and conflict preemption are not “rigidly distinct,” see English v. General Elec. Co., 496 U.S. 72, 79 n. 5, 110 S.Ct. 2270, 2275 n. 5, 110 L.Ed.2d 65 (1990),[6] implying, based upon its definitions, that field and conflict preemption are indistinguishable. Technically, all forms of federal preemption can be described as (and meet the definition of) conflict preemption,[7] for the *353 simple reason that preemption only occurs when a state action conflicts with congressional intent.[8] In spite of its extremely broad definition, however, conflict preemption does not refer to the entire range of all federal preemption. Instead, courts use the term quite narrowly — it applies when a state regulation conflicts with federal law in a non-occupied field.[9] See Silkwood, 464 U.S. at 248, 104 S.Ct. at 621 (“If Congress has not entirely displaced state regulation over the matter in question, state law is still preempted to the extent it actually conflicts with federal law.”).
The Majority fails to make this distinction. It compares the definitions of conflict and field preemption and argues that field preemption is simply a presumption of conflict preemption over an entire area of law.[10] Because all three categories of federal preemption technically fall within the definition of conflict preemption, any state regulation (or judicial proceeding, as in this case) subject to field preemption would also be barred under the technical definition of conflict preemption. See English, 496 U.S. at 79, 110 S.Ct. at 2275 (defining conflict preemption, in part, to apply when “state law ‘stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress’ ”).
However — and this is the critical point— in this case, the only reason that the challenged state actions (the appeals) satisfy the definition of conflict preemption is because Congress has preempted the field. The Majority never asserts that the appeals at issue make it “impossible to comply with both state and federal law,” but merely that they frustrate congressional intent to legislate exclusively in this area. In other words, as the Majority phrases it, conflict preemption holds because the state proceedings “interfere with the purposes and objectives of the federal plan.” Majority at 348. The “federal plan,” I suppose, refers to Congress’ intent to occupy the field át issue. Thus, the Majority's argument, when closely scrutinized, goes something like this: (1) Congress preempted the field, and (2) the appeals at issue constitute state action within that field; therefore, (3) the appeals conflict with congressional intent to legislate exclusively. The Majority’s reasoning implicitly recognizes that Congress intended to occupy the field at issue. As such, I would affix the proper “label” to N.E. Hub’s preemption claim. When a state law “conflicts” with “the purposes and objectives” of Congress to occupy a given field, courts label it field, not conflict, preemption.[11]
The Majority’s second argument further underscores its implicit recognition that Congress has preempted the field.[12] The *354 Majority argues that it need not classify the claim at issue, because either field or conflict preemption can bar a legal process such as the appeals in this case.[13] See Majority at 347 (“[T]he process preemption cases do not confine themselves to the field occupation context.”). The Majority cites no case in which any court has held that conflict preemption bars an unfinished legal process with an indeterminate outcome. I too was unable to find such a case.[14]
The only scenario in which I can possibly envision conflict preemption barring an on-going legal proceeding is one in which the outcome sought by the party opposing preemption is certain to conflict with federal law. In other words, for conflict preemption to apply, the relief sought by CNGT and Penn Fuel would have to conflict totally with FERC’s 7(c) certificate. This is not the case. It is entirely possible that the Environmental Hearing Board could, as a result of the appeals at issue, impose additional requirements on N.E. Hub that would not conflict with the 7(c) certificate.[15]
In sum, the Majority purports to avoid categorizing N.E. Hub’s claim. In reality, however, it rejects field preemption and requires the District Court to apply conflict preemption upon remand, even though its reasoning assumes that Congress has occupied the field. According to the Supreme Court, conflict preemption should be applied only if “Congress has not entirely displaced state regulation over the matter in question” explicitly or through implied field preemption. Silkwood, 464 U.S. at 248, 104 S.Ct. at 621. In this case, the overwhelming weight of Supreme Court precedent indicates that Congress intended the NGA to occupy the field at issue. As a result, I disagree with the Majority’s approach and would instead apply field preemption.
B.
The District Court addressed the classification issue explicitly. It held that field preemption does not apply, because FERC had affirmatively limited its own jurisdiction. It noted that “[although the Natural Gas Act might be read to completely preempt any state regulation of the transport, storage and sale of natural gas in interstate commerce, FERC has interpreted its jurisdiction under the Natural Gas Act to allow for some state regulation.” MemOp. at 13. In effect, the District Court held that FERC refused to occupy the given field and instead partially delegated its responsibilities to the states. The Majority seems to endorse this conclusion hesitantly in a footnote, terming this case a “hybrid” situation. See Majority at 346-47 n. 13.
*355 The District Court’s analysis, and the Majority’s reference to it, is flawed. Admittedly, Chevron v. NRDC, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984), often requires courts to defer to an agency’s statutory interpretation, and we have held that Chevron deference extends to an agency’s interpretation of its own jurisdiction. See Puerto Rico Mar. Shipping Auth. v. Yalley Freight Sys., Inc., 856 F.2d 546, 552 (3d Cir.1988) (“This rule of deference is fully applicable to an agency’s interpretation of its own jurisdiction.”). However, courts need only defer to an agency when the intent of Congress is unclear. See Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781-82 (“If the .intent of Congress is clear, that is the end of the matter.”).[16] Here, as previously discussed, the intent of Congress to occupy the entire field is, and has been for decades, clearly established by the Supreme Court. As a result, FERC could not limit its jurisdiction in the face of contrary, clear congressional intent. See id. at 843 n. 9, 104 S.Ct. at 2781 n. 9 (“The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.”).
Furthermore, based upon my reading of Maritimes, FERC did not intend to restrict its jurisdiction. See 1997 WL 812154, at *8. Quite the contrary — it exercised its wide-ranging jurisdiction in order to require that natural gas companies comply with state regulations as a condition to granting a 7(c) certificate. After reaffirming the NGA’s preemption of state and local regulation, FERC stated that “as a matter of policy, ... the Commission has imposed upon applicants a requirement that they cooperate with State and local authorities.” Id. (emphasis added). FERC did not limit its own jurisdiction, but rather used its authority to implement a policy objective. If it had, in fact, abdicated its jurisdiction, it would have been unable to impose state regulations upon anyone.
It is undisputed by both the Majority and the District Court that Congress intended federal law to occupy the entire field at issue. Because neither FERC nor this Court have the discretion to contravene clear congressional intent, field preemption should apply. The ripeness of N.E. Hub’s conflict preemption claim is therefore irrelevant.
III.
Finally, I address the merits of N.E. Hub’s field preemption claim. First of all, it is clearly ripe. We require that a claim satisfy three elements in order to be ripe for decision: “adversity of the interests of the parties, conclusiveness of the judicial judgment and the practical help, or utility, of that judgment.” Step-Saver Data Systems, Inc. v. Wyse Technology, 912 F.2d 643, 647 (3d Cir.1990). All three are satisfied. The state proceedings' themselves constitute an injury establishing adversity of interest. See Sayles Hydro Assocs. v. Maughan, 985 F.2d 451, 454 (9th Cir.1993) (holding that in the field preemption context, “[t]he hardship is the process itself.”).[17] A decree indicating that FERC’s *356 7(c) certificate preempted all state regulation of N.E. Hub’s project would be “conclusive” under any definition of the term, see Step-Saver, 912 F.2d at 648, and it would be “useful,” because it would allow N.E. Hub to proceed with its project. See id.
Apparently, the District Court agreed that if field preemption applied, N.E. Hub’s claim was ripe. After a lengthy and unnecessary discussion of the ripeness of the conflict preemption claim, it moved immediately to the merits of the field preemption claim (without discussing its ripeness). The court held that the claim failed on its merits:
NE Hub’s alternative theory, that Pennsylvania lacks authority to subject NE Hub Project to any regulation whatsoever, must also fail on jurisdictional grodnds. Such an attack constitutes a challenge to the express provisions of the 7(c) certificate issued by FERC to NE Hub, which clearly contemplate and even direct NE Hub’s compliance with state regulation. As pointed out by Defendants CNGT and Penn Fuel in their motions to dismiss, the Court lacks jurisdiction over such a challenge to the 7(c) certificate, as NE Hub failed to apply to FERC for a rehearing of its April 29, 1998 Order issuing the 7(c) certifícate.
MemOp. at 18-19 (citations omitted). I agree with the Court’s reasoning and outcome, but it would be helpful to elaborate further. FERC’s 7(c) certificate required compliance with state and local regulations. Specifically, it stated that:
Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this certificate. The Commission encourages cooperation between interstate pipelines and local authorities. However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities by this Commission.
J.A. at 109. The District Court interpreted this language to require that N.E. Hub obtain “any and all necessary state or local permits required to carry out the drilling and construction program.” MemOp. at 5. In addition, the 7(c) certificate also contained a number of more specific provisions that required compliance with individual state regulations. See MemOp. at 14-15.
FERC’s discretion in granting a 7(c) certificate is far-reaching. Section 717f(e) of the NGA provides that, “[t]he Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require.” 15 U.S.C. § 717f(e). Under this authority, FERC required compliance with state and local regulations as long as they did not “prohibit or unreasonably delay the construction or operation of [the] facilities.” J.A. at 109. FERC did not abdicate its jurisdiction; it exercised it.
This interpretation is consistent with FERC’s discussion of state regulations in Maritimes, 1997 WL 812154, at *8. In that case, FERC described its “requirement” that applicants cooperate with state and local authorities as being something it had “imposed” as “a matter of policy.” Id. A plain reading suggests that FERC was simply exercising its wide jurisdiction over the field, requiring applicants to comply with state and local regulations that impose additional, non-conflicting measures. Were an actual conflict to arise, FERC noted that its decisions would control.
FERC could have required, subsequent to its § 717f(e) authority, that applicants comply with conditions identical to those found in state regulations. It is unclear why, and indeed N.E. Hub has failed to argue that, requiring compliance with *357 state regulations that impose potentially non-conflicting conditions would be outside FERC’s authority. Even if it were, as the District Court held, N.E. Hub’s proper course would have been to challenge the validity of FERC’s 7(c) certificate by seeking a rehearing within thirty days of its issuance. See 15 U.S.C. § 717r(a). It failed to do so. N.E. Hub cannot now collaterally attack FERC’s authority under § 717f(e) by challenging a state appellate process that FERC implicitly sanctioned. See City of Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, 335-36, 78 S.Ct. 1209, 1218-19, 2 L.Ed.2d 1345 (1958); Williams Natural Gas Co. v. City of Oklahoma City, 890 F.2d 255, 262 (10th Cir.1989) (“[A] challenger may not collaterally attack the validity of a prior FERC order in a subsequent proceeding ... whether the collateral action is brought in state court or federal court.”).
IV.
I would affirm the District Court’s decision based upon its disposition of the one legitimate claim at issue-N.E. Hub’s argument that the state proceedings at issue are field preempted by FERC’s 7(c) certificate. Field preemption does apply, but FERC exercised its wide-ranging authority to require compliance with state regulations. Because N.E. Hub failed to challenge FERC’s authority directly, it cannot now challenge the 7(c) certificate in this Court. The District Court properly held that it lacked jurisdiction over the claims at issue, and as a result, N.E. Hub’s claims were properly dismissed.

. Because Congress failed to describe explicitly the extent to which the NGA preempts state regulation of natural gas facilities, the first of the aforementioned circumstances (express preemption) does not apply.

. See e.g., Interstate Natural Gas Co. v. Federal Power Comm'n, 331 U.S. 682, 690, 67 S.Ct. 1482, 1487, 91 L.Ed. 1742 (1947) (“As was stated in the House Committee Report, the ‘basic purpose' of Congress in passing the Natural Gas Act was to occupy this field in which the Supreme Court has held that the States may not act.”); Pennsylvania Medical Soc’y v. Marconis, 942 F.2d 842, 847 (3d Cir.1991) ("The field of matters relating to wholesale sales and transport of natural gas in interstate commerce [has] been occupied by federal legislation.”); Public Utils. Comm’n of State of California v. FERC, 900 F.2d 269, 274 (D.C.Cir.1990) ("Cases are legion affirming the exclusive character of FERC jurisdiction where it applies ... under the NGA.”); Algonquin Lng v. Loqa, 79 F.Supp.2d 49, 51 (D.R.I.2000) (“Congress clearly has manifested an intent to occupy the field.").

. The District Court explicitly addressed the field preemption claim, "NE Hub’s alternative theory, that Pennsylvania lacks authority to subject the NE Hub Project to any regulation whatsoever.” MemOp. at 18. The court characterized the claim as a direct "challenge to the express provisions of [FERC's] 7(c) certificate,” and found that it lacked jurisdiction because N.E. Hub should have appealed directly to FERC. MemOp. at 18.

. The Majority argues that we need not categorize the preemption claim in order to analyze its ripeness. However, the District Court only found ripeness lacking in the conflict preemption claim; therefore, we need not address ripeness unless the claim is one of conflict preemption.

. The Majority believes that FERC delegated its occupation of the field, at least in part, to the states. Therefore, any "conflicts” that arose could form the basis of a conflict preemption claim in federal court. The important difference between us is that I believe FERC continued to maintain its ultimate authority. Because it continued to occupy the field, it maintained its discretion to interpret the terms of its 7(c) certificate. If an alleged "conflict” arose, it was up to FERC to determine if the certificate had been violated. Our review of such a decision would be the same as our review of any other action by an administrative agency in an occupied field. In sum, the Majority and I disagree over who should deter mine whether the state actions at issue were "consistent” with FERC's certificate. The Majority believes that FERC delegated that authority to the federal courts. I believe that FERC maintained its discretion.

. The Supreme Court footnote from which the Majority derives its argument nonetheless explicitly upheld the three categories of preemption. See English, 496 U.S. at 79 n. 5, 110 S.Ct. at 2275 n. 5 ("[Bjecause we previously have adverted to the three-category framework, we invoke and apply it here.”).

. According to its broad definition, conflict preemption applies whenever a state regulation "actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.” See Silkwood, 464 U.S. at 248, 104 S.Ct. at 621 (citations omitted); see also e.g., English, 496 U.S. at 79, 110 S.Ct. at 2275 (citations omitted).

. Courts have identified, and labeled, three forms of federal preemption (express, field, and conflict preemption) that vary according to their scope. According to the Supreme Court, "[f]requently, the preemptive 'label' we choose will carry with it substantive implications for the scope of preemption.” Gade v. National Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 104 n. 2, 112 S.Ct. 2374, 2386 n. 2, 120 L.Ed.2d 73 (1992).

. Conflict preemption in an occupied field would be unnecessary and duplicative, because all state regulation is barred by field preemption.

. See e.g., English, 496 U.S. at 79 n. 5, 110 S.Ct. at 2275 n. 5 ("[F]ield preemption may be understood as a species of conflict preemption: A state law that falls within a preempted field conflicts with Congress’ intent (either express or plainly implied) to exclude state regulation.”).

. In a footnote, the Majority claims that "by no means do we mean to obliterate the distinction between the types of preemption, and we recognize the continuing existence of each.” Majority at 348 n. 16. However, if we need not classify the preemption claim in this case, in spite of Supreme Court precedent explicitly holding that Congress has occupied the field, I fail to see how the distinction retains any force.

. For the remainder of this dissent, I refer to conflict preemption in the manner that courts apply it (in a non-occupied field) rather than according to its sweeping definition, which encompasses all forms of federal preemption.

. I assume that when the Majority uses the term “process preemption," it is referring to a federal preemption claim based upon an ongoing legal process. Unlike conflict or field preemption, "process preemption” is not a term of art; in fact, a Westlaw search revealed that no federal court has ever used the term.

. The Majority relies upon two unsupported assertions: (1) its own belief that “certain regulatory acts clearly would conflict with federal law, and it is as logical to preempt state process concerning such matters as state actions in occupied fields,” and (2) a statement by the administrator of the Pennsylvania Department of Environmental Protection that the agency lacked jurisdiction to "conduct final appealability decisionmaking” in this matter. Majority at 347.

.The Majority states that conflict preemption bars "the process with respect to the 30 Issues,” because its outcome is "almost certain to conflict with federal law.” Majority at 347 n. 14. In practice, I seriously doubt that a court could effectively isolate state proceedings likely to lead to conflicting outcomes from those that could possibly lead to "additional requirements ... that do not conflict with the 7(c) certificate.” Majority at 347 n. 14. Forcing courts to do so would in effect require them to predict the outcomes of unfinished legal proceedings in separate jurisdictions. I suspect that this difficulty explains why courts have widely refused to apply conflict preemption to bar an ongoing state process, and have instead relied upon field preemption when it is appropriate.

. See also Neal v. United States, 516 U.S. 284, 295, 116 S.Ct. 763, 769, 133 L.Ed.2d 709 (1996) (“Absent ... compelling evidence bearing on Congress’ original intent, our system demands that we adhere to our prior interpretations of statutes.”); Maislin Indus., U.S., Inc. v. Primary Steel, Inc., 497 U.S. 116, 131, 110 S.Ct. 2759, 2768, 111 L.Ed.2d 94 (1990) (“Once we have determined a statute's clear meaning, we adhere to that determination under the doctrine of stare decisis, and we judge an agency’s later interpretation of the statute against our prior determination of the statute’s meaning.’’).

. See also Freehold, 44 F.3d at 1189 (holding that a field preemption claim was ripe because “the plaintiff did not challenge the state's ultimate substantive decision, but rather its authority to conduct proceedings.”); Middle South Energy, Inc. v. Arkansas Pub. Serv. Comm’n, 772 F.2d 404, 410-11 (8th Cir.1985) (claim ripe where the plaintiff "challenges not the state’s ultimate substantive decision but its authority to even conduct the contemplated proceeding. It can hardly be doubted that a controversy sufficiently concrete for judicial review exists when the pro *356 ceeding sought to be enjoined is already in progress.”).