Edward P. Leibensperger, Nancy E. Watters, David Abelman, Nutter, McClennen & Fish, Boston, Mass., for plaintiffs.

James S. Dittmar, Richard J. Yurko, Sanford F. Remz, Widett, Slater & Goldman P.C., Boston, Mass., for defendant.

NOMAD ACQUISITION CORPORATION; Nomad Partners, L.P.; Ballantrae Partners, L.P. and American Magnetics Corporation

v.

**DAMON CORPORATION.**

Civ. A. No. 88–2016–Z.

United States District Court, D. Massachusetts.

Oct. 21, 1988.

### MEMORANDUM OF DECISION

ZOBEL, District Judge.

Plaintiff Nomad Acquisition Corporation [1] ("Nomad") seeks declaratory and injunctive relief restraining application by defendant Damon Corporation ("Damon") of the powers granted under the statute entitled Regulation of Control Share Acquisitions of Foreign Corporation, Mass.Gen.L. ch. 110E ("the Act") to shares of Damon stock owned or acquired by plaintiffs.[2] In their complaint, plaintiffs request a declaration that the Act is unconstitutional, an injunction prohibiting the defendant from exercising the powers granted under the Act, and costs and attorney's fees. In the motion presently before the Court, Nomad requests both a preliminary injunction prohibiting Damon from applying or seeking to apply the powers granted under the Act

---

1. Nomad Acquisition Corporation is a wholly-owned subsidiary of Nomad Partners, L.P., and American Magnetics is the general partner of Nomad Partners. Ballantrae Partners, L.P. is the sole limited partner in Nomad Partners.

2. The Commonwealth was granted leave to intervene for the purpose of defending the Act.

and partial summary judgment declaring the Act unconstitutional. Defendant asserts that the Act is constitutional but that in any event, the issue is not ripe for decision. Because a decision at this time would be premature, the motions for preliminary injunction and partial summary judgment are denied.[3]

These facts are not in dispute. In late October, 1987, Ballantrae Partners ("Ballantrae") and American Magnetics Corporation ("AMC") began purchasing Damon common stock, and by late March, 1988 had acquired 9.97% of Damon's outstanding shares. Currently, AMC and Ballantrae own in excess of 10% of Damon common stock. On August 18, 1988, following unsuccessful attempts to negotiate an acquisition of Damon, Nomad commenced a cash tender offer for any and all shares not owned by its affiliates. The tender offer was conditioned, in part, on judicial invalidation of the Act.

The Act regulates the acquisition of shares of stock of firms organized under the laws of states other than Massachusetts. It provides that a person who acquires stock in a "control share acquisition" may vote that stock only if the disinterested shareholders of the acquired company vote to approve enfranchisement. Neither the acquiring person nor the officers or employee-directors of the acquired corporation may participate in the enfranchisement vote. A "control share acquisition" results when an acquiring person holds voting rights equal to or greater than any one of three thresholds (20%, 33⅓%, 50%) following an acquisition of shares. A person seeking "control shares" may give notice of his intent to do so and request an enfranchisement vote.

To be covered by the Act, corporations must include the appropriate provisions in their bylaws or charter prior to the control share acquisition. Damon has not yet adopted the Act's provisions although a vote of Damon's board of directors could amend Damon's bylaws at any time to allow for coverage. Damon has stipulated

that it will not do so without providing Nomad 48 hours notice.

The threshold question for the Court is whether the plaintiff's allegations present a case or controversy within the meaning of Article III of the United States Constitution or only abstract questions not currently justiciable by a federal court. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 297, 99 S.Ct. 2301, 2308, 60 L.Ed. 2d 895 (1979). The contentions of the parties must " 'present a real, substantial controversy ..., a dispute definite and concrete, not hypothetical or abstract.' " *Id.* at 298, 99 S.Ct. at 2308 (quoting *Railway Mail Ass'n v. Corsi*, 326 U.S. 88, 93, 65 S.Ct. 1483, 1487, 89 L.Ed. 2072 (1945)). However, under the ripeness doctrine, a court may exercise discretion when determining whether judicial resolution would be desirable under all of the circumstances. *Brown v. Ferro Corp.*, 763 F.2d 798, 801 (6th Cir.), *cert. denied*, 474 U.S. 947, 106 S.Ct. 344, 88 L.Ed.2d 291 (1985). The Supreme Court's two-prong test for ripeness requires that a case present issues fit for judicial determination at the time of suit and that a denial of judicial review would cause hardship to the plaintiff. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). The First Circuit has adopted the Supreme Court's summary of this two-prong ripeness test that requires a "realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *McCollester v. City of Keene, N.H.*, 668 F.2d 617, 619 & n. 4 (1st Cir.1982) (quoting *Babbitt*, 442 U.S. at 298, 99 S.Ct. at 2308 (citing *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974))). The policy behind the ripeness doctrine is to avoid consideration of a case that " 'involves uncertain contingent future events that may not occur as anticipated, or indeed may not occur at all.' " *Metzenbaum v. FERC*, 675 F.2d 1282, 1289 (D.C.Cir.1982) (quoting 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction* § 3532, at 237–38 (1975)).

---

**3.** Plaintiff may renew its request for a preliminary injunction or partial summary injunction if the issues ripen at some future date.

Nomad forcefully argues that absent injunctive relief, the possibility of enforcement of the Act will cause it irreparable harm because if Damon opts for coverage under the Act, Nomad will suffer a delay in voting or possibly a complete deprivation of its right to vote the shares acquired in its tender offer. The First Circuit has noted that "timing is everything with tender offers, and ... delay [can] effectively kill [a] takeover bid." *Hyde Park Partners v. Connolly,* 839 F.2d 837, 853 (1st Cir.1988). But Nomad may never suffer any deprivation or appreciable delay. If Damon never opts in to the Act, Nomad suffers no delay caused by the Act. If Damon adopts the Act's provisions, then Nomad faces delay or deprivation only if Damon's board of directors votes not to reverse its decision to opt in to the Act. Furthermore, following adoption of the Act by Damon and a control share acquisition by Nomad, plaintiff may again apply for injunctive relief and summary judgment. If the Act is deemed constitutional, then Nomad has suffered and will suffer no unconstitutional delay. And if the Act is held unconstitutional, Nomad suffers only that delay imposed by the Williams Act and the relatively minor delay associated with obtaining the necessary relief. Thus, at least three plausible contingencies exist that result in no serious delay for Nomad.

Nomad also argues that it suffers irreparable harm because of the uncertainty surrounding a successful enfranchisement vote and because of the uncertainty regarding applicability of the Act. According to Nomad, this uncertainty "chills" its tender offer, making shareholders less willing to tender their stock. Nomad implicitly attributes any "chill" to the uncertainty regarding the Act. But in fact Nomad conditions its tender offer on no fewer than seven special conditions[4] and a host of conditions that commonly accompany any tender offer.[5] For example, the Delaware Legislation Condition creates obstacles to the takeover similar to those that the Act imposes.[6] Similarly, Nomad conditions its offer on Damon not infusing capital into Damon Biotech, Inc. (the Restructuring Condition). The record before this Court simply does not allow a determination that one rather than another condition has caused the "chill" that Nomad perceives. Thus, I cannot conclude that the Act alone or even in large measure has put the "nip in the air" surrounding this takeover attempt.

In support of its position, Nomad punctuates its briefs with several cases in which courts have dealt with challenges to various antitakeover statutes or portions thereof. However, the posture of each of those cases differed from the posture of this case in that the acquiror's takeover action had proceeded beyond where a "realistic danger" of harm to the plaintiff was created. For example, in *Hyde Park Partners v.*

---

**4.** The special conditions in Nomad's tender offer include the Minimum Condition (a majority of Damon shares must be tendered); the Rights Condition (redemption or invalidation of a dividend distribution that creates class B common stock); the Merger Condition (Damon and Nomad must enter into a merger agreement satisfactory to Nomad); the Restructuring Condition (Damon must not effect a restructuring of the company); the Financing Condition (Nomad must obtain sufficient financing to purchase for cash all outstanding shares); the Delaware Legislation Condition (the terms of Delaware's business combination statute must be satisfied or declared inapplicable or invalid); and the Massachusetts Law Condition (the Massachusetts antitakeover statute must be satisfied or declared inapplicable or invalid).

**5.** Among the conditions, Nomad requires that there be no material adverse change in the value of Damon, that no suspension of trading in

Damon securities occur, and that there is no change in the number of Damon shares.

**6.** According to Nomad's tender offer document, Delaware law would prevent Nomad as an "interested" stockholder from effecting a "business combination" for three years unless Nomad could meet certain conditions. For example, Nomad could seek approval from Damon's board of directors for the merger, acquire 85% of the Damon stock outstanding at the time Nomad commenced its transaction, or obtain approval for the transaction from both Damon's board of directors and two-thirds of Damon's shareholders.

Counsel have also informed the Court that several shareholder suits are pending in Delaware, the state of incorporation of Damon. These are actions to invalidate a number of defensive measures adopted by management, at least some of which the Chancellor has upheld.

*Connolly*, 839 F.2d 837 (1st Cir.1988), the acquiror had clearly violated the terms of the notice portion of the Massachusetts antitakeover statute. At the time the acquiror commenced its court action, enforcement of the statute would have placed a moratorium on the tender offer. In *Newell Co. v. Connolly*, 624 F.Supp. 126 (D.Mass. 1985), the acquiror was in violation of that portion of the Massachusetts takeover statute dealing with "creeping tender offers." Even though the target and the Massachusetts Attorney General indicated to the court that they did not intend to enforce the statute at that time, the target did not waive any right or abjure any reliance on the Massachusetts statute. *Mesa Petroleum Co. v. Cities Service Co.*, 715 F.2d 1425 (10th Cir.1983), involved the commencement of a tender offer without notification of Oklahoma authorities as required under that state's antitakeover statute. The acquiror, Mesa Petroleum, sought a preliminary injunction barring enforcement of the statute but commenced its tender offer the very next day. Again, this created a "realistic danger" for the acquiror because it had clearly violated the notification provisions of the Oklahoma statute. And in *TLX Acquisition Corp. v. Telex Corp.*, 679 F.Supp. 1022 (W.D.Okla.1987), the plaintiff sought relief from the Oklahoma antitakeover statute on grounds very much similar to those advanced by Nomad. However, TLX Acquisition demonstrated that it would suffer immediate irreparable harm amounting to $1.5 million unless the court granted an injunction. In *TLX*, the takeover statute was the only remaining obstacle preventing the acquiror from securing its financing and proceeding with its tender offer. Nomad cannot presently claim that the Act remains as the final link in the chain of events necessary for its takeover to proceed.

In the two most prominent Supreme Court cases involving antitakeover statutes, *CTS Corp. v. Dynamics Corp.*, 481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987) and *Edgar v. MITE Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), antitakeover provisions had already been adopted by the targets at the time of decision. In *CTS*, when the acquiror, Dynam-

ics Corp., sought to enjoin enforcement of the Indiana antitakeover statute, the CTS board of directors had already opted for coverage under the Indiana statute. The lower court specifically ruled that at that point in time, the issue of the constitutionality of the Indiana statute was ripe for decision. *Dynamics Corp. v. CTS Corp.*, 637 F.Supp. 389, 391–94 (N.D.Ill.1986). In *MITE*, the acquiror commenced a tender offer and purposely failed to comply with the terms of the Illinois antitakeover statute. Instead, it sought to enjoin enforcement of the statute. *Edgar v. MITE Corp.*, 457 U.S. 624, 627–28, 102 S.Ct. 2629, 2632–33, 73 L.Ed.2d 269 (1982). In both cases, therefore, the acquirors faced a realistic danger of sustaining a direct injury as a result of the antitakeover statute's operation or enforcement.

This case presents a substantially different picture. Nomad's tender offer is subject to several other serious unresolved conditions. Damon has not yet adopted the Act through its bylaws or charter. Nothing in the record suggests with any certainty that Damon will ever invoke the provisions of the Act. Although the threat of adoption creates some risk for Nomad that any control share acquisition it might make would leave it with nonvoting shares, this "threat" currently represents a mere contingency based upon one of several options that Damon might take, not upon a "realistic danger" sufficient to meet the requirements of ripeness. To paraphrase the Ninth Circuit, "Courts do not decide questions that can only be phrased in the [conditional or] subjunctive." *California Energy Resources Conservation and Dev. Comm'n v. Johnson*, 783 F.2d 858, 866 (9th Cir.1986). "Unconstitutional statutes there may be, but unless they are involved in a case properly susceptible of judicial determination, the courts have no power to pronounce that they are unconstitutional." C. Wright, *The Law of Federal Courts* 54 (4th ed. 1983).

Plaintiff's motions are denied.